**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| VIDEOLABS, INC. | Civil Action No.:  2:25-cv-704 |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| GIGA-BYTE Technology Co., Ltd., | |
| Defendant. | |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff VideoLabs, Inc. ("VideoLabs") through its attorneys, for its Complaint against GIGA-BYTE Technology Co., Ltd. ("GIGA-BYTE"), demands a trial by jury and alleges as follows:

## **INTRODUCTION**

1.     Digital video has become fundamental to how society interacts, communicates, educates, and entertains. In fact, video consumption now accounts for more than 82% of all Internet traffic.[1] The ability to reliably provide high-quality and secure video content drives the growth of digital platforms that are increasingly integral to the global economy.

2.     The advent of high-quality video as a staple of digital consumption did not happen instantaneously. As with any complex technology, digital video presented implementation challenges. Many companies spent many years and resources to develop new and innovative technologies that guide how video is created, streamed, secured, managed, and consumed.

3.     Various inventions and technological advances have transformed digital video. Some of these technologies, such as techniques to efficiently compress video file size, address central challenges to storing and transmitting video. Others enable video content to be efficiently and securely streamed to the many user devices that exist today. Yet others involve managing and organizing videos to provide viewers easier access to content and address how they interact with content. Successful video streaming thus requires a myriad of technologies that necessarily coordinate with one another.

4.     Because various companies played roles in developing the foundational technology for today's digital video, no single company can provide the high-quality video experiences that consumers have come to expect without using technology owned by other companies. Companies

---

[1] *See The Sustainable Future of Video Entertainment*, INTERDIGITAL (Aug. 2020), https://www.interdigital.com/white_papers/the-sustainable-future-of-video-entertainment?submit_success=true.

wisely focus their innovation activities and R&D investments on developing unique products and services while relying on the sum total of all other industry investment in the various technologies that enable their products and services to work in the global, connected technology market.

5.    The founders of VideoLabs recognized this problem and understood that collective action was needed to address it. If the companies that developed critical video technologies worked together, everyone could benefit: all innovators could receive fair compensation for their contributions, companies deploying video technology could respect other innovators' patented technologies and license them on affordable and predictable terms, and consumers could experience better and more affordable video technology.

6.    In 2019, with support from widely recognized industry leaders, VideoLabs launched a platform to achieve these goals. VideoLabs spent millions of dollars and thousands of hours analyzing the video space and identifying the patents that reflect the innovations with the highest impact. VideoLabs then compiled a portfolio of these core patents, obtaining them from leading companies, including Hewlett Packard Enterprise, Alcatel-Lucent S.A., Siemens AG, Swisscom AG, 3Com, Panasonic, LG, and Nokia.

7.    VideoLabs then opened-up participation in its platform to all willing companies. In exchange for low-cost membership or licensing fees, VideoLabs provides efficient access to its aggregated patent portfolio and a commitment to seek out the most important patents in the video industry and acquire them to the benefit of the industry. Many prominent companies recognized the benefits of the VideoLabs platform and worked with VideoLabs to efficiently and responsibly license its video technology patents.

8.    Today, VideoLabs' licensing platform has evolved and grown significantly from the early days. VideoLabs' primary focus continues to be serving patent implementers in the broader

video industry by identifying, acquiring, aggregating, and licensing high-quality patents through its unique collective platform and providing companies flexible licensing structures (including membership) for more efficient licensing. VideoLabs has expanded its focus on serving patent innovators to provide them a better path to realize fair compensation for their patents. VideoLabs also works in partnership with patent owners by building and running independent licensing programs specifically focused on licensing the partner's patent portfolio as a service to them and the IP industry.

9.     To this day, VideoLabs continues to promote an efficient, respected, and balanced intellectual property environment where technology companies have predictable design freedom and innovators who contribute impactful patented inventions can obtain fair and just compensation. It has and continues to successfully bring on many patent owners, licensees and members to its efficient and equitable licensing platform. Equitable licensing dictates that all patent implementers accept their responsibility to license. When one (or many) peer company(ies) elects to holdout or refuses to negotiate in good faith for a license to valid patents that are infringed and enforceable, it unfairly disadvantages those companies who chose to license responsibly.

10.     Unfortunately, GIGA-BYTE has not worked responsibly to license VideoLabs' video technology patents. GIGA-BYTE is one of the world's largest users of video technologies and sells laptops, desktops and computer peripherals, among other products.

11.     VideoLabs contacted GIGA-BYTE in March and August 2023 to offer GIGA-BYTE the benefit of VideoLabs' platform and to alert it to its use of VideoLabs' patented technology. Despite the parties engaging in licensing discussions, GIGA-BYTE refuses to take a license. Accordingly, VideoLabs felt that it had no recourse but to file an action to stop GIGA-BYTE's unauthorized use of VideoLabs' patents. Failure to take action would undermine the equity and viability of VideoLabs' licensing platform and permit further free riding by GIGA-BYTE of the

significant innovations of VideoLabs' patents.

12.     This case is ultimately about ensuring the integrity of the patent system and compensating patent owners for their protected innovations. Respect for intellectual property, as the law requires, is essential to incentivize innovation and promote technological progress. Accordingly, VideoLabs brings this action under the patent laws, 35 U.S.C. § 1 *et seq.*, in order to stop GIGA-BYTE's willful infringement of U.S. Patent Nos. 8,291,236, 7,769,238, 8,139,878, 7,970,059, and 8,208,542 (collectively, "Asserted Patents").

## THE PARTIES

13.     VideoLabs was founded in 2018 as part of an industry-sponsored and funded effort to reduce the cost and risk of technological gridlock associated with diverse patent ownership. VL's leadership has decades of experience in intellectual property licensing, during which they have completed over 1,000 intellectual property transactions worldwide and drawn more than $6 billion in revenue.

14.     VideoLabs is a corporation organized under the laws of the State of Delaware, with its principal place of business in Palo Alto, California.

15.     On information and belief, GIGA-BYTE Technology Co., Ltd., is a Taiwanese company with its principal place of business at No. 6, Baoqiang Rd., Xindian Dist., New Taipei City, 231, Taiwan. GIGA-BYTE may be served with process pursuant to the provisions of the Hague Convention. GIGA-BYTE may also be served with process by serving the Texas Secretary of State at 1019 Brazos Street, Austin, Texas 78701 as its agent for service because it engages in business in Texas but has not designated or maintained a resident agent for service of process in Texas as required by statute.

16.     GIGA-BYTE is a leading manufacturer and seller of computers and server equipment

in the world and in the United States. Upon information and belief, GIGA-BYTE does business in Texas and in the Eastern District of Texas directly and/or through intermediaries.

## **JURISDICTION AND VENUE**

17.     This action arises under the patent laws of the United States, Title 35 of the United States Code. Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 and 1338(a).

18.     This Court has personal jurisdiction over GIGA-BYTE in this action pursuant to due process and/or the Texas Long Arm Statute because (1) GIGA-BYTE conducts business and continues to conduct business in Texas, (2) GIGA-BYTE has committed and continues to commit acts of patent infringement in this District, by among other things, making, using, offering to sell and selling accused products in Texas and/or importing accused products into Texas, including by Internet sales via GIGA-BYTE's website and sales via other online retailers such as Newegg and Amazon, in addition to sales via retail and wholesale stores and/or committing at least a portion of any other infringement alleged herein and (3) GIGA-BYTE has regularly placed its products within the stream of commerce, directly, through subsidiaries or through third-parties, with the expectation and knowledge that such products, such as computers, will be shipped to, sold or used in Texas and elsewhere in the United States. Accordingly, GIGA-BYTE has established minimum contacts within Texas and purposefully availed itself of the benefits of Texas and the exercise of personal jurisdiction over GIGA-BYTE would not offend traditional notions of fair play and substantial justice.   In addition, or in the alternative, this Court has personal jurisdiction over GIGA-BYTE pursuant to Fed. R. Civ. P. 4(k)(2).

19.     On information and belief, GIGA-BYTE has derived substantial revenues from such infringing acts, including from its sales of infringing devices in the United States.

20.     Venue is proper in this District pursuant to at least 28 U.S.C. §1391 and §1400(b). On information and belief, GIGA-BYTE has conducted and continues to conduct business in this District; (2) GIGA-BYTE has committed and continues to commit acts of patent infringement in this District and (3) GIGA-BYTE does not reside in the United States and may be sued in any judicial district pursuant to 28 U.S.C. §1391(c)(3).

## THE VIDEOLABS ASSERTED PATENTS

### A.  U.S. Patent No. 8,291,236

21.     U.S. Patent No. 8,291,236 (the "'236 patent"), titled "Methods and Apparatuses for Secondary Conditional Access Server," issued on October 16, 2012. VideoLabs owns all rights and title to the '236 patent, as necessary to bring this action. A true and correct copy of the '236 patent is attached as Exhibit A.

22.     The original assignee of the '236 patent is Digital Keystone, Inc. ("Digital Keystone") a Silicon-Valley based video technology company. Digital Keystone develops digital entertainment technologies, including security software for video applications. In the early 2000s, when the inventions of the '236 patent were in development, Digital Keystone was developing world-first digital entertainment solutions that bridged the personal computer, consumer electronics and content industries. Next generation digital cable TVs, PC-based entertainment systems and media distribution networks were powered by Digital Keystone hardware and software technologies. And Digital Keystone was also licensing its industry-leading security technology to TV broadcasters, consumer electronics manufacturers, developers of digital home components, and chip manufacturers.[2] In partnership with Microsoft and CableLabs, Digital Keystone developed the world's first secure Pay

---

[2] *Company Overview*, Digital Keystone (2003).
https://web.archive.org/web/20031206063740/http://www.digitalkeystone.com/profile/mission.htm

TV bridge, which was demonstrated by Bill Gates in his keynote speech during the 2006 Consumer Electronics Show.[3] Digital Keystone was at the forefront of enabling secure content access throughout the entire home.

23.     Conditional access ("CA") refers to techniques for limiting the access of content (such as TV programs and movies) to authorized users. CA systems have historically been developed for both cable TV (CAS) and, more recently, for OTT services (DRM). Regardless of the implementation, conditional access serves as a type of access management, requiring certain criteria to be met before granting access to protected content. For example, in a CA system for digital television, the media content is scrambled (encrypted) before broadcasting. The key used for scrambling/descrambling the media content in a CA system is called a control word, and it is securely provided to subscribers through entitlement control messages and entitlement management messages. A security device, such as a set top box, uses the control word to descramble (decrypt) the received media content and reproduce the content for display. Similarly, in a DRM system for content streaming, the content is encrypted before distribution. The key(s) used for encrypting the media content in a DRM system is/are typically maintained by a license server and requested by the media player when the content is attempted to be played. The license server authenticates the requesting user, and the decryption keys are provided to permitted users. The media player uses the received keys to decrypt and render the content for viewing.

---

[3] *Microsoft and CableLabs Announce Agreement to Enable High-Definition Digital Cable Programming on Windows-Based PCs* (Press release), Microsoft, November 16, 2005; *Gates Outlines Vision for the Digital Lifestyle and Showcases New Products and Technologies From Microsoft* (Press release), Microsoft, January 4, 2006.
https://news.microsoft.com/2005/11/16/microsoft-and-cablelabs-announce-agreement-to-enable-high-definition-digital-cable-programming-on-windows-based-pcs/.

24.     In digital television, for example, the media content (e.g., video and audio signals) is converted into a digital form using the MPEG-2 format. The digital form of the media content of one program is multiplexed together with those of other programs for transmission so that multiple programs appear to be transmitted simultaneously. The CA system scrambles the digital form of programs and transmits the entitlement control messages and the entitlement management messages with the digital form of programs for broadcast either within the multiplex (e.g., satellite) or through an out-of-band channel (e.g., cable).

25.     Typically, a set-top box (STB) at the receiving end descrambles the data stream and decodes the MPEG-2 data for viewing. A tuner portion of the STB receives the incoming signal, demodulates it and reconstitutes the transport stream, which contains many packets of information. The STB can de-multiplex the entitlement management messages and entitlement control messages and the media content. The data (e.g., service key and control word) contained in the entitlement management message and entitlement control message are used to descramble the encrypted programming material. The STB then renders the MPEG-2 data for viewing.

26.     A digital rights management (DRM) system manages rights digitally. Digital rights management uses encryption software to protect electronic information and prevent widespread distribution. In a typical digital rights management scheme, a DRM server software program "wraps" the digital content through encryption according to applicable policies. A DRM client software program "unwraps" the content and makes it accessible in accordance with its rights. The rights are typically distributed to clients separately from the "wrapped" electronic information. DRM clients may include desktop PCs, handheld devices, set-top boxes, mobile phones and other portable devices. In addition to encrypting/scrambling the digital content to limit the distribution, a digital rights

management system may also provide the description, identification, trading, protection, monitoring and tracking of various forms of rights.

27.    Both CAS and DRM systems are critically important technologies for securing valuable content programming intended for myriad consumer devices. To individually manage each such device, such as a set-top box, a mobile phone, a streaming media device, a laptop or desktop computer, or a smartTV, each device is typically provided with a unique identity so that the CA or DRM system can provide the necessary keys specifically for use on only the intended device. In this way, the integrity of the decryption keys can be maintained within the content provider's security domain. Typically, each device has a unique, secret user key so that an entitlement management message or a DRM license key for one device can only be decrypted using the unique user key of that device.

28.    In the early-2000s, content consuming devices were proliferating rapidly, each with different device security platforms and capabilities, and content delivery standards were evolving to address the growing need for securing the integrity of the content being delivered to myriad networked devices. Conditional access techniques at the time of the invention suffered from the problem of being limited to one security technique so that each device was required to be associated with the security technique to operate correctly in a network.

29.    The '236 patent addresses this problem by providing a more flexible security model that could allow devices to operate correctly under different security techniques while still maintaining the benefits of the primary security system of a content provider with full ability to control the dissemination of content securely across networking components with different security features and platforms. Ex. A at 2:56-60 ("bridging two security systems so that a primary security system can control premium content distribution to external devices secured by a secondary security

system"). The '236 patent allows, among other things, content to be distributed to legitimate, authorized devices of two different security systems. *Id.* at 3:1-7. The inventors developed a novel approach by implementing a new type of networked device to bridge primary and secondary security domains and pass access-protected content from the primary security domain to the secondary security domain, such as a localized network within the home, or the Internet, so that authorized devices in the secondary security domain can access secured content. *Id.* at 7:19-43; 7:66 – 8:2; 8:39-61. The inventors recognized that incorporating security messages into the primary conditional access protocols could allow the networked device to act as a client in the primary security domain and as a control information provider of the secondary security domain. *Id.* at 7:19-39. The networked device common to both domains could then conditionally allow clients in the secondary security domain to access the content, converting the protected content from one protected format to another protected format. *Id.* at 7:40-43; 17:42-51.

30.     As such, the '236 patent describes and claims novel improvements to the networked system allowing content to be distributed to proper devices, including devices that do "not support[] the primary digital rights management system" of the content provider. *Id.* at 3:8-15. The '236 patent thus allows, among other things, securely transferring content (e.g., premium video content) to a greater number of devices and types of devices.

**B.  U.S. Patent No. 7,769,238**

31.     On August 3, 2010, the United States Patent Office issued U.S. Patent No. 7,769,238, titled "Picture Coding Method And Picture Decoding Method" (the "'238 patent").  VideoLabs owns all rights and title to the '238 patent, as necessary to bring this action. A true and correct copy of the '238 patent is attached hereto as Exhibit B.

32.     The '238 patent generally relates to video and audio coding. Video and audio coding

refers to both the encoding and decoding of video or audio content. Video and audio coding may include compression techniques that minimize the size of the data that is sent between the encoder and the decoder by, e.g., removing redundancies and then efficiently representing the remaining data for transmission.

33.     The '238 patent was developed by engineers at Panasonic, one of the largest consumer electronics companies at the time of the invention and a major innovator in Internet technologies. In 2002, when the patent application was first filed for the '238 patent, and as set forth in Panasonic's 2002 annual report, Panasonic was a world leader in digital video technologies. Panasonic developed video coding technologies and designed consumer electronics, including TVs, DVD players and memory cards, for storing, processing and displaying video content. The inventions of the '238 patent are the result of years of research by Panasonic engineers at the cutting edge of video processing and coding.

34.     Encoding video content allows the content to be made small for storage and transmission, while decoding pursuant to the '238 patent permits the viewer to watch high-quality content on his or her device. In addition to making real-time streaming of content possible, every incremental increase in compression efficiency yields substantial benefits to companies that store, process, transmit or access video.

35.     The '238 patent describes breakthrough techniques for decoding audiovisual content so that it can be transmitted and stored with fewer resources. The patent vastly improves upon existing methods, and the core technology it describes has been used throughout the industry for years as the gold standard for coding video.

36.     In particular, the '238 patent is directed to decoding audio and video content. With respect to video, the '238 patent describes a type of coding called "Context-based Adaptive Variable

Length Coding," or "CAVLC." *See, e.g.*, Ex. B at 1:49-52. Content encoded would then be stored or transmitted before ultimately being decoded for playback using the techniques of the '238 patent.

37.     When encoded, the image data in a particular image block is represented by, among other things, "coefficients." *Id*. at 1:63-67; 7:38-43; 21:60-66; 25:29-36. Larger coefficients for a block may indicate a larger amount of changes in that block as compared with a reference block. *See id.* For many blocks, there are no such changes, and so all the coefficients have a value of zero. *See id.* at 21:60-66. The inventors of the '238 patent recognized that these "zero-coefficient" blocks allow for compression. *See*, *e.g.*, *id.* at 1:49-52.

38.     The inventors of the '238 patent realized that the decoder did not need to know every single time a zero-coefficient block existed; rather, the decoder needs to know only when blocks have *non-zero* coefficients. They devised a technique wherein data about zero-coefficient blocks are effectively not encoded at all, and only non-zero coefficient block data is stored and transmitted. *See*, *e.g.*, *id.* at 1:49-52, 56-62; l: 65- 2:10. The inventors thereby achieved nearly perfect compression for these zero-coefficient blocks by communicating them practically without sending any information whatsoever. *See id.* at 2:11-14.

39.     The inventors made substantial contributions to the efficiency of entropy coding. They recognized that the coefficients in neighboring blocks were a good predictor of the coefficients in the block being analyzed and so could be used to select the optimal coding table for the block, yielding enhanced compression. *See, e.g.*, *id.* at 9:34-37; 13:4-11. The inventors disclosed using the same coding table for both inter- and intra-predictive coding, which was inefficient because there could be significant differences between neighboring blocks in the current frame and blocks in subsequent frames. *See, e.g.*, *id.* at 1:33-38. Due to these limitations in the use of coding tables, compression efficiency in previously known entropy coding techniques would vary significantly between different

types of content and generally decreased as the quality of content increased. *Id.* at 1:39-44. These problems (and others) were overcome by the inventors of the '238 patent.

40.    The innovations of the '238 patent provided a significant advance in compression that was recognized throughout the industry. In fact, the compression techniques of the '238 patent are used in the ubiquitous video codec, H.264. H.264 was revolutionary in the video industry, as it provided a quantum leap of improvement over the video codecs that had previously been commonly used, such as Motion JPEG video and MPEG-2. In particular, H.264 "has an 80% lower bitrate than Motion JPEG video" and "the bitrate savings can be as much as 50% or more compared to MPEG-2."[4]

C.    U.S. Patent No. 8,139,878

41.    On March 20, 2012, the United States Patent Office issued U.S. Patent No. 8,139,878, titled "Picture Coding Method And Picture Decoding Method" (the "'878 patent"). VideoLabs owns all rights and title to the '878 patent, as necessary to bring this action. A true and correct copy of the '878 patent is attached hereto as Exhibit C.

42.    The '878 patent, which shares the same specification with the '238 patent generally relates to video and audio coding. Video and audio coding refers to both the encoding and decoding of video or audio content. Video and audio coding may include compression techniques that minimize the size of the data that is sent between the encoder and the decoder by, e.g., removing redundancies and then efficiently representing the remaining data for transmission.

43.    The '878 patent was developed by engineers at Panasonic, one of the largest consumer

---

[4] *What is H264 Encoding?* BlackBox, https://www.blackbox.co.uk/gb-gb/page/38313/Resources/Technical-Resources/Black-Box-Explains/AV/What-is-H264-video-encoding/.

electronics companies at the time of the invention and a major innovator in Internet technologies. In 2002, when the patent application was first filed for the '878 patent, and as set forth in Panasonic's 2002 annual report, Panasonic was a world leader in digital video technologies. Panasonic developed video coding technologies and designed consumer electronics, including TVs, DVD players and memory cards, for storing, processing and displaying video content. The inventions of the '878 patent are the result of years of research by Panasonic engineers at the cutting edge of video processing and coding.

44.     Encoding video content pursuant to the inventions of the '878 patent allows the content to be made small for storage and transmission, while decoding permits the viewer to watch high-quality content on his or her device. In addition to making real-time streaming of content possible, every incremental increase in compression efficiency yields substantial benefits to companies that store, process, transmit or access video.

45.     The '878 patent describes breakthrough techniques for encoding audiovisual content so that it can be transmitted and stored with fewer resources. The patent vastly improves upon existing methods, and the core technology it describes has been used throughout the industry for years as the gold standard for coding video.

46.     In particular, the '878 patent is directed to encoding audio and video content. With respect to video, the '878 patent describes a type of coding called "Context-based Adaptive Variable Length Coding," or "CAVLC." *See, e.g.*, Ex. C at 1: 49-52. Content encoded would then be stored or transmitted before ultimately being decoded for playback using the techniques of the '238 patent.

47.     When encoded, the image data in a particular image block is represented by, among other things, "coefficients." *Id*. at 1:63-67; 7:38-43; 21:60-66; 25:29-36. Larger coefficients for a block may indicate a larger amount of changes in that block as compared with a reference block. *See*

*id.* For many blocks, there are no such changes, and so all the coefficients have a value of zero. *See id.* at 21:60-66. The inventors of the '878 patent recognized that these "zero-coefficient" blocks allow for compression. *See*, *e.g.*, *id.* at 1:49-52.

48.    The inventors of the '878 patent realized that the decoder did not need to know every single time a zero-coefficient block existed; rather, the decoder needs to know only when blocks have *non-zero* coefficients. They devised a technique wherein data about zero-coefficient blocks are effectively not encoded at all, and only non-zero coefficient block data is stored and transmitted. *See*, *e.g.*, *id.* 1:49-52, 56-62; 1:65 – 2:10. The inventors thereby achieved nearly perfect compression for these zero-coefficient blocks by communicating them practically without sending any information whatsoever. *See id.* at 2:11-14.

49.    The inventors made substantial contributions to the efficiency of entropy coding. They recognized that the coefficients in neighboring blocks were a good predictor of the coefficients in the block being analyzed and so could be used to select the optimal coding table for the block, yielding enhanced compression. *See, e.g.*, *id.* at 9:34-37; 13:4-11. The inventors disclosed using the same coding table for both inter- and intra-predictive coding, which was inefficient because there could be significant differences between neighboring blocks in the current frame and blocks in subsequent frames. *See, e.g.*, *id.* at 1:33-38. Due to these limitations in the use of coding tables, compression efficiency in previously known entropy coding techniques would vary significantly between different types of content and generally decreased as the quality of content increased. *Id.* at col. 1:39-44. These problems (and others) were overcome by the inventors of the '878 patent.

50.    The innovations of the '878 patent provided a significant advance in compression that was recognized throughout the industry. In fact, the compression techniques of the '878 patent are used in the ubiquitous video codec, H.264. H.264 was revolutionary in the video industry, as it

provided a quantum leap of improvement over the video codecs that had previously been commonly used, such as Motion JPEG video and MPEG-2. In particular, H.264 "has an 80% lower bitrate than Motion JPEG video" and "the bitrate savings can be as much as 50% or more compared to MPEG-2."[5]

### D.    U.S. Patent No. 7,970,059

51.    On June 28, 2011, the United States Patent Office issued U.S. Patent No. 7,970,059, titled "Variable Length Coding Method and Variable Length Decoding Method" (the "'059 patent"). VL owns all rights and title to the '059 patent, as necessary to bring this action. A true and correct copy of the '059 patent is attached hereto as Exhibit D.

52.    The '059 patent generally relates to video and audio coding. Video and audio coding refers to both the encoding and decoding of video or audio content. Video and audio coding may include compression techniques to minimize the size of the data that is sent between the encoder and the decoder by removing redundancies and then efficiently representing the remaining data for transmission.

53.    The '059 patent was developed by engineers at Panasonic, one of the largest consumer electronics companies at the time of the invention and a major innovator in Internet technologies. In 2002, when the patent application was first filed for the '059 patent, and as set forth in Panasonic's 2002 annual report, Panasonic was a world leader in digital video technologies. Panasonic developed video coding technologies and designed consumer electronics, including TVs, DVD players and memory cards, for storing, processing and displaying video content. The inventions of the '059 patent are the result of years of research by Panasonic engineers at the cutting edge of video processing and

---

[5] *What is H264 Encoding?* BlackBox, https://www.blackbox.co.uk/gb-gb/page/38313/Resources/Technical-Resources/Black-Box-Explains/AV/What-is-H264-video-encoding/.

coding.

54.     Encoding video content pursuant to the '059 patent allows the content to be made small for storage and transmission, while decoding permits the viewer to watch high-quality content on his or her device. In addition to making real-time streaming of content possible, every incremental increase in compression efficiency yields substantial benefits to companies that store, process, transmit or access video.

55.     The '059 patent describes breakthrough techniques for decoding audiovisual content so that it can be transmitted and stored with fewer resources. The patent vastly improves upon existing methods for coding video.

56.     In particular, the '059 patent is directed to decoding audio and video content. With respect to video, the '059 patent describes a type of coding called "Context-based Adaptive Binary Arithmetic Coding," or "CABAC," and the '059 patent describes using a plurality of probability tables that are switched during the coding process. *See, e.g.*, Ex. D at 1:49-56.

57.     An arithmetic encoder converts a series of input signals into a representation that may be encoded as a single fractional number, which is communicated in the encoded bitstream. As a result, fewer or less common symbol values are represented using fewer or larger numbers of bits, which can lead to more effective compression than variable length coding.

58.     The innovations of the '059 patent provided a significant advance in compression that was recognized throughout the industry. In fact, the compression techniques of the '059 patent are used in the ubiquitous video codec, H.264. H.264 was revolutionary in the video industry, as it provided a quantum leap of improvement over the video codecs that had previously been commonly used, such as Motion JPEG video and MPEG-2. In particular, H.264 "has an 80% lower bitrate than Motion JPEG video" and "the bitrate savings can be as much as 50% or more compared to MPEG-

2."[6]

E.    **U.S. Patent No. 8,208,542**

59.    On June 16, 2012, the United States Patent Office issued U.S. Patent No. 8,208,542 (the "'542 patent"), titled "Moving Picture Coding Method and Moving Picture Decoding Method." VideoLabs owns all rights and title to the '542 patent, as necessary to bring this action. A true and correct copy of the '542 patent is attached hereto as Exhibit E.

60.    The '542 patent was developed by engineers at Panasonic, one of the largest consumer electronics companies at the time of the invention and a major innovator in Internet technologies. In 2002, when the patent application was first filed for the '542 patent, and as set forth in Panasonic's 2002 annual report, Panasonic was a world leader in digital video technologies. Panasonic developed video coding technologies and designed consumer electronics, including TVs, DVD players and memory cards, for storing, processing and displaying video content. The inventions of the '542 patent are the result of years of research by Panasonic engineers at the cutting edge of video processing and coding.

61.    The '542 patent describes breakthrough techniques to provide a moving picture coding apparatus for realizing an effective coding as well as a reduction of the processing burden when a plural reference picture interpolation prediction is performed.

62.    To address the drawbacks of prior art coding techniques, the inventors of the '542 patent created a novel moving picture coding apparatus that codes/decodes each picture composing an input moving picture on a block-by-block basis and determines a picture shared for reference among a plurality of blocks on which coding is performed with reference to a coded picture,

---

[6] *What is H264 Encoding?*, BlackBox, BlackBox, https://www.blackbox.co.uk/gb-gb/page/38313/Resources/Technical-Resources/Black-Box-Explains/AV/What-is-H264-video-encoding/.

generates a predictive image using the common reference picture, and codes a current block to be coded using the predictive image. *See, e.g.*, Ex. E at 6:29-44.

63.    Accordingly, when the predictive image is generated using a reference picture, the processing burden can be reduced because the coding/decoding of the reference picture on a block-by-block basis is not necessary. *Id.*, at 6:45-50.

## FIRST COUNT

## (INFRINGEMENT OF U.S. PATENT NO. 8,291,236)

64.    VideoLabs incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

65.    VideoLabs is the assignee and lawful owner of all right, title, and interest in and to the '236 patent. The '236 patent is valid and enforceable.

66.    On information and belief, GIGA-BYTE has directly infringed and continues to directly infringe one or more claims of the '236 patent, including at least claim 130 of the '236 patent by, among other things, making, using, selling, offering for sale, and/or importing into the United States products that embody one or more of the inventions claimed in the '236 patent, including but not limited to the '236 patent Accused Instrumentalities, including GIGA-BYTE devices compatible with HDCP, including GIGA-BYTE devices configured to stream 4K and/or HDR content, such as, e.g., GIGA-BYTE's laptops and desktops. As an example, the Accused Instrumentalities include the GIGA-BYTE G6 laptop as well as all reasonably similar products, in violation of 35 U.S.C. § 271(a).

67.    The '236 patent Accused Instrumentalities satisfy all claim limitations of one or more claims of the '236 patent. A claim chart comparing exemplary independent claim 130 of the '236 patent to representative Accused Instrumentalities is attached as Exhibit F.

68.    By making, using, offering for sale, selling and/or importing into the United States the

'236 patent Accused Instrumentalities, GIGA-BYTE has injured VideoLabs and is liable for infringement of the '236 patent pursuant to 35 U.S.C. § 271(a).

69.    GIGA-BYTE has been on notice of its infringement since at least August 1, 2023, when VideoLabs sent a licensing presentation including a claim chart of the '236 patent to GIGA-BYTE and specifically informed GIGA-BYTE of its infringement of the '236 patent.

70.    GIGA-BYTE of course knows how its products operate, and on information and belief, upon receiving notice of the '236 patent, began investigating the '236 patent and its infringement. GIGA-BYTE has been given further notice of its infringement of the '236 patent through the filing of the Complaint in this Action. On information and belief, GIGA-BYTE is either knowingly infringing the '236 patent or is willfully blind to its infringement and continuing to act in wanton disregard of VideoLabs' patent rights.

71.    Despite becoming aware of or willfully blinding itself to its infringement of the '236 patent, GIGA-BYTE has nonetheless continued to engage in and has escalated its infringing activities by continuing to develop, advertise, make available, sell, offer to sell and use the '236 patent Accused Instrumentalities. On information and belief, GIGA-BYTE has made no attempts to design around the '236 patent or otherwise stop its infringing behavior.

72.    GIGA-BYTE's infringement of the '236 patent therefore has been and remains willful.

73.    As a result of GIGA-BYTE's infringement of the '236 patent, VideoLabs is entitled to monetary damages in an amount adequate to compensate for GIGA-BYTE's infringement, but in no event less than a reasonable royalty for the use made of the invention by GIGA-BYTE, together with interest and costs as fixed by the Court.

74.    On information and belief, despite having knowledge of the '236 patent and knowledge that it is infringing one or more claims of the '236 patent, GIGA-BYTE has nevertheless

continued its infringing conduct and disregarded an objectively high likelihood of infringement. GIGA-BYTE's infringing activities relative to the '236 patent have been, and continue to be, willful, wanton, malicious, deliberate, consciously wrongful, and an egregious case of misconduct beyond typical infringement such that VideoLabs is entitled to enhanced damages under 35 U.S.C. § 284 up to three times the amount found or assessed.

75.    GIGA-BYTE's acts of infringement have caused and continue to cause damage to VideoLabs. VideoLabs is entitled to damages in accordance with 35 U.S.C. §§ 271, 281, and 284 sustained as a result of GIGA-BYTE's wrongful acts in an amount to be proven at trial.

<u>**SECOND COUNT**</u>

<u>**(INFRINGEMENT OF U.S. PATENT NO. 7,769,238)**</u>

76.     VideoLabs incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

77.    VideoLabs is the assignee and lawful owner of all right, title, and interest in and to the '238 patent. The '238 patent is valid and enforceable.

78.    On information and belief, GIGA-BYTE has infringed claim 1 of the '238 patent by, among other things, having made, used, sold, offered for sale, and/or imported into the United States products that embody one or more of the inventions claimed in the '238 patent, including but not limited to the '238 patent Accused Instrumentalities, including GIGA-BYTE devices (e.g., laptops, desktops, servers, and motherboards) configured to support the H.264 standard. As an example, the Accused Instrumentalities include the GIGA-BYTE G6 laptop as well as all reasonably similar products, in violation of 35 U.S.C. § 271(a).

79.    The '238 patent Accused Instrumentalities satisfy all claim limitations of claim 1 of the '238 patent. A claim chart comparing independent claim 1 of the '238 patent to representative

Accused Instrumentalities is attached as Exhibit G.

80.    By having made, used, offered for sale, sold and/or imported into the United States the '238 patent Accused Instrumentalities, GIGA-BYTE has injured VideoLabs and is liable for infringement of the '238 patent pursuant to 35 U.S.C. § 271(a).

81.    GIGA-BYTE has been on notice of its infringement since at least March 21, 2023 when VideoLabs wrote to Chih-Peng Chiu, General Counsel of GIGA-BYTE, and specifically informed GIGA-BYTE of its infringement of the '238 patent.

82.    GIGA-BYTE of course knows how its products operate, and on information and belief, upon receiving notice of the '238 patent, began investigating the '238 patent and its infringement. On information and belief, GIGA-BYTE either knowingly infringed the '238 patent or was willfully blind to its infringement and continued to act in wanton disregard of VideoLabs' patent rights.

83.    Despite becoming aware of or willfully blinding itself to its infringement of the '238 patent, GIGA-BYTE continued to engage in and escalate its infringing activities by continuing to develop, advertise, make available, sell, offer to sell and use the '238 patent Accused Instrumentalities. On information and belief, GIGA-BYTE made no attempts to design around the '238 patent or otherwise stop its infringing behavior prior to the expiration of the '238 patent.

84.    GIGA-BYTE's infringement of the '238 patent therefore has been willful.

85.    As a result of GIGA-BYTE's infringement of the '238 patent, VideoLabs is entitled to monetary damages in an amount adequate to compensate for GIGA-BYTE's infringement, but in no event less than a reasonable royalty for the use made of the invention by GIGA-BYTE, together with interest and costs as fixed by the Court.

86.    On information and belief, despite having knowledge of the '238 patent and

knowledge that it has infringed the '238 patent, GIGA-BYTE nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement prior to the expiration of the '238 patent. GIGA-BYTE's infringing activities relative to the '238 patent have been willful, wanton, malicious, deliberate, consciously wrongful, and an egregious case of misconduct beyond typical infringement such that VideoLabs is entitled to enhanced damages under 35 U.S.C. § 284 up to three times the amount found or assessed.

87.     GIGA-BYTE's acts of infringement have caused damage to VideoLabs. VideoLabs is entitled to damages in accordance with 35 U.S.C. §§ 271, 281, and 284 sustained as a result of GIGA-BYTE's wrongful acts in an amount to be proven at trial.

## THIRD COUNT

## (INFRINGEMENT OF U.S. PATENT NO. 8,139,878)

88.      VideoLabs incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

89.     VideoLabs is the assignee and lawful owner of all right, title, and interest in and to the '878 patent. The '878 patent is valid and enforceable.

90.     On information and belief, GIGA-BYTE has infringed and continues to infringe claim 1 of the '878 patent by, among other things, having made, used, sold, offered for sale, and/or imported into the United States products that embody one or more of the inventions claimed in the '878 patent, including but not limited to the '878 patent Accused Instrumentalities, including GIGA-BYTE devices configured to perform video encoding consistent with the H.264, including, e.g., GIGA-BYTE's laptops, desktops, servers, and motherboards. As an example, the Accused Instrumentalities include the GIGA-BYTE G6 laptop as well as all reasonably similar products, in violation of 35 U.S.C. § 271(a).

91.    The '878 patent Accused Instrumentalities satisfy all claim limitations of claim 1 of the '878 patent. A claim chart comparing independent claim 1 of the '878 patent to representative Accused Instrumentalities is attached as Exhibit H.

92.    By having made, used, offered for sale, sold and/or imported into the United States the '878 patent Accused Instrumentalities, GIGA-BYTE has injured VideoLabs and is liable for infringement of the '878 patent pursuant to 35 U.S.C. § 271(a).

93.    GIGA-BYTE has been on notice of its infringement since at least March 21, 2023 when VideoLabs wrote to Chih-Peng Chiu, General Counsel of GIGA-BYTE and specifically informed GIGA-BYTE of its infringement of the '878 patent.

94.    GIGA-BYTE of course knows how its products operate, and on information and belief, upon receiving notice of the '878 patent, began investigating the '878 patent and its infringement. On information and belief, GIGA-BYTE either knowingly infringed the '878 patent or was willfully blind to its infringement and is continuing to act in wanton disregard of VideoLabs' patent rights.

95.    Despite becoming aware of or willfully blinding itself to its infringement of the '878 patent, GIGA-BYTE continued to engage in and escalate its infringing activities by continuing to develop, advertise, make available, sell, offer to sell and use the '878 patent Accused Instrumentalities. On information and belief, GIGA-BYTE made no attempts to design around the '878 patent or otherwise stop its infringing behavior.

96.    GIGA-BYTE's infringement of the '878 patent therefore has been and remains willful.

97.    As a result of GIGA-BYTE's infringement of the '878 patent, VideoLabs is entitled to monetary damages in an amount adequate to compensate for GIGA-BYTE's infringement, but in no event less than a reasonable royalty for the use made of the invention by GIGA-BYTE, together

with interest and costs as fixed by the Court.

98.    On information and belief, despite having knowledge of the '878 patent and knowledge that it is infringing the '878 patent, GIGA-BYTE nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. GIGA-BYTE's infringing activities relative to the '878 patent have been and continue to be willful, wanton, malicious, deliberate, consciously wrongful, and an egregious case of misconduct beyond typical infringement such that VideoLabs is entitled to enhanced damages under 35 U.S.C. § 284 up to three times the amount found or assessed.

99.    GIGA-BYTE's acts of infringement have caused and continue to cause damage to VideoLabs. VideoLabs is entitled to damages in accordance with 35 U.S.C. §§ 271, 281, and 284 sustained as a result of GIGA-BYTE's wrongful acts in an amount to be proven at trial.

## FOURTH COUNT

## (INFRINGEMENT OF U.S. PATENT NO. 7,970,059)

100.    VideoLabs incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

101.    VideoLabs is the assignee and lawful owner of all right, title, and interest in and to the '059 patent. The '059 patent is valid and enforceable.

102.    On information and belief, GIGA-BYTE has infringed one or more claims of the '059 patent, including at least claim 1 of the '059 patent by, among other things, having made, used, sold, offered for sale, and/or imported into the United States products that embody one or more of the inventions claimed in the '059 patent, including but not limited to the '059 patent Accused Instrumentalities, including GIGA-BYTE devices (e.g., laptops, desktops, servers, and motherboards) configured to support the H.264 standard. As an example, the Accused

-26-

Instrumentalities include the GIGA-BYTE G6 laptop as well as all reasonably similar products, in violation of 35 U.S.C. § 271(a).

103. The '059 patent Accused Instrumentalities satisfy all claim limitations of one or more claims of the '059 patent. A claim chart comparing exemplary independent claim 1 of the '059 patent to representative Accused Instrumentalities is attached as Exhibit I.

104. By having made, used, offered for sale, sold and/or imported into the United States the '059 patent Accused Instrumentalities, GIGA-BYTE has injured VideoLabs and is liable for infringement of the '059 patent pursuant to 35 U.S.C. § 271(a).

105. GIGA-BYTE has been on notice of its infringement since at least March 21, 2023, when VideoLabs wrote to Chih-Peng Chiu, General Counsel of GIGA-BYTE, and specifically informed GIGA-BYTE of its infringement of the '059 patent.

106. GIGA-BYTE of course knows how its products operate, and on information and belief, upon receiving notice of the '059 patent, began investigating the '059 patent and its infringement. On information and belief, GIGA-BYTE either knowingly infringed the '059 patent or was willfully blind to its infringement and continued to act in wanton disregard of VideoLabs' patent rights.

107. Despite becoming aware of or willfully blinding itself to its infringement of the '059 patent, GIGA-BYTE engaged in and escalated its infringing activities by developing, advertising, making available, selling, offering to sell and using the '059 patent Accused Instrumentalities prior to the expiration of the '059 patent. On information and belief, GIGA-BYTE has made no attempts to design around the '059 patent or otherwise stop its infringing behavior prior to the expiration of the '059 patent.

108. GIGA-BYTE's infringement of the '059 patent therefore has been willful.

109.    As a result of GIGA-BYTE's infringement of the '059 patent, VideoLabs is entitled to monetary damages in an amount adequate to compensate for GIGA-BYTE's infringement, but in no event less than a reasonable royalty for the use made of the invention by GIGA-BYTE, together with interest and costs as fixed by the Court.

110.    On information and belief, despite having knowledge of the '059 patent and knowledge that it infringed one or more claims of the '059 patent, GIGA-BYTE nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. GIGA-BYTE's infringing activities relative to the '059 patent have been willful, wanton, malicious, deliberate, consciously wrongful, and an egregious case of misconduct beyond typical infringement such that VideoLabs is entitled to enhanced damages under 35 U.S.C. § 284 up to three times the amount found or assessed.

111.    GIGA-BYTE's acts of infringement have caused damage to VideoLabs. VideoLabs is entitled to damages in accordance with 35 U.S.C. §§ 271, 281, and 284 sustained as a result of GIGA-BYTE's wrongful acts in an amount to be proven at trial.

## FIFTH COUNT

## (INFRINGEMENT OF U.S. PATENT NO. 8,208,542)

112.    VideoLabs incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

113.    VideoLabs is the assignee and lawful owner of all right, title, and interest in and to the '542 patent. The '542 patent is valid and enforceable.

114.    On information and belief, GIGA-BYTE has directly infringed and continues to directly infringe one or more claims of the '542 patent, including at least claim 1 of the '542 patent by, among other things, having made, used, sold, offered for sale, and/or imported into the United

States and continuing to make, use, sell, offer for sale and import products that embody one or more of the inventions claimed in the '542 patent, including but not limited to the '542 patent Accused Instrumentalities, including Gigabyte devices configured to perform video encoding consistent with the H.265 (aka HEVC) standard, the VP9 standard, and/or the AV1 standard, including, e.g., Gigabyte's laptops, desktops, servers, and motherboards. As an example, the Accused Instrumentalities include the Gigabyte G6 laptops as well as all reasonably similar products, in violation of 35 U.S.C. § 271(a).

115.    The '542 patent Accused Instrumentalities satisfy all claim limitations of one or more claims of the '542 patent. A claim chart comparing exemplary independent claim 1 of the '542 patent to representative Accused Instrumentalities is attached as Exhibit J.

116.    By making, using, offering for sale, selling and/or importing into the United States the '542 patent Accused Instrumentalities, GIGA-BYTE has injured VideoLabs and is liable for infringement of the '542 patent pursuant to 35 U.S.C. § 271(a).

117.    GIGA-BYTE has been on notice of its infringement since at least March 21, 2023, when VideoLabs wrote to Chih-Peng Chiu, General Counsel of GIGA-BYTE and specifically informed GIGA-BYTE of its infringement of the '542 patent.

118.    GIGA-BYTE of course knows how its products operate, and on information and belief, upon receiving notice of the '542 patent, began investigating the '542 patent and its infringement. On information and belief, GIGA-BYTE either knowingly infringed the '542 patent or was willfully blind to its infringement and continues to act in wanton disregard of VideoLabs' patent rights.

119.    Despite becoming aware of or willfully blinding itself to its infringement of the '542 patent, GIGA-BYTE engaged in and continues to engage in and escalate its infringing activities by

developing, advertising, making available, selling, offering to sell and using the '542 patent Accused Instrumentalities. On information and belief, GIGA-BYTE has made no attempts to design around the '542 patent or otherwise stop its infringing behavior.

120.    GIGA-BYTE's infringement of the '542 patent therefore has been and remains willful.

121.    As a result of GIGA-BYTE's infringement of the '542 patent, VideoLabs is entitled to monetary damages in an amount adequate to compensate for GIGA-BYTE's infringement, but in no event less than a reasonable royalty for the use made of the invention by GIGA-BYTE, together with interest and costs as fixed by the Court.

122.    On information and belief, despite having knowledge of the '542 patent and knowledge that it infringes one or more claims of the '542 patent, GIGA-BYTE has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. GIGA-BYTE's infringing activities relative to the '542 patent have been and continue to be willful, wanton, malicious, deliberate, consciously wrong, and an egregious case of misconduct beyond typical infringement such that VideoLabs is entitled to enhanced damages under 35 U.S.C. § 284 up to three times the amount found or assessed.

123.    GIGA-BYTE's acts of infringement have caused and continue to cause damage to VideoLabs. VideoLabs is entitled to damages in accordance with 35 U.S.C. §§ 271, 281, and 284 sustained as a result of GIGA-BYTE's wrongful acts in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

VideoLabs respectfully requests that the Court find in favor of VideoLabs and against GIGA-BYTE, and the Court grant VideoLabs the following relief:

A.    For judgment that GIGA-BYTE is liable for infringement of one or more claims of the Asserted Patents, either literally and/or under the doctrine of equivalents;

B.      For judgment that GIGA-BYTE has willfully infringed one or more claims of the Asserted Patents, either literally and/or under the doctrine of equivalents;

C.      For an accounting of all damages sustained by VideoLabs as the result of GIGA-BYTE's acts of infringement, including compensatory damages in an amount according to proof, and in no event less than a reasonable royalty;

D.      For a judgment and order requiring GIGA-BYTE to pay VideoLabs' damages, costs, expenses, and pre- and post-judgment interest for its infringement of the Asserted Patents as provided under 35 U.S.C. § 284;

F.      For a judgment and order finding that this is an exceptional case within the meaning of 35 U.S.C. § 285 and awarding to VideoLabs its reasonable attorneys' fees; and

G.      For such other and further relief in law and in equity as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, VideoLabs hereby demands a trial by jury of this action.

Dated: July 11, 2025

Respectfully submitted,

*/s/ M. Elizabeth Day*
M. Elizabeth Day (*admitted in EDTX*)
California Bar No. 177125
eday@bdiplaw.com
Marc Belloli (*admitted in EDTX*)
California Bar No. 244290
mbelloli@bdiplaw.com
Jerry D. Tice II
Texas State Bar No. 24093263
jtice@bdiplaw.com
**BUNSOW DE MORY LLP**
701 El Camino Real,
Redwood City, CA 94063
Tel: (650) 351-7248
Fax: (415) 426-4744

*Attorneys for Plaintiff*
VIDEOLABS, INC.

-32-